**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MARIBEL GUERRA,

                Plaintiff,

      v.                          Case No. C-1-08-666

CONVERGYS CUSTOMER
MANAGEMENT GROUP, INC.,

                Defendant.

## ORDER

This matter is before the Court upon a motion for summary judgment filed by defendant Convergys Customer Management Group, Inc. (Convergys) (doc. 17), plaintiff's opposing memorandum (doc. 23), and defendant's reply (doc. 47). Defendant has filed proposed findings of fact and conclusions of law, which plaintiff has highlighted as true, false, or irrelevant (doc. 22). Oral arguments on the motion were held on June 15, 2010.

### I. Introduction

Plaintiff alleges in the complaint that she is a Hispanic female; she began working for Convergys in August 1999; she conducted training in Cincinnati in September and October, 2006; while in Cincinnati, the Senior Manager, Ellis Halbert, informed her that "fitting in" with the "corporate image" was important; in October, she was informed that she needed to relocate to Cincinnati by November 1, 2006; on November 10, 2006, defendant suspended her with pay while it purportedly conducted an investigation into allegations of misconduct; when she

1

inquired further as to why she was being suspended, the Human Resources Manager informed her that her Caucasian subordinates had complained that she was socializing with them inappropriately; defendant terminated her employment on November 16, 2006, alleging violations of its Code of Business Conduct; and upon information and belief, she was replaced by two Caucasian males.

Plaintiff brings claims for race and national origin discrimination in violation of 42 U.S.C. § 2000, et seq., and Ohio Rev. Code Ch. 4112, alleging that she is Hispanic; she was qualified for her position at all relevant times; defendant treated her differently than similarly-situated Caucasian employees; defendant terminated her on account of her race and national origin; and defendant replaced her with less qualified Caucasian employees (Counts I, II, III and IV). Plaintiff also brings claims for gender discrimination in violation of 42 U.S.C. § 2000, et seq., and Ohio Rev. Code Ch. 4112, alleging that defendant treated her differently than similarly-situated males, terminated her on account of her gender, and replaced her with less qualified male employees (Counts V and VI). Finally, plaintiff brings a claim for wrongful discharge in violation of Ohio public policy alleging that there are clear public policies expressed in both state and federal law that employees cannot be discharged because of their race, national origin or gender; defendant's actions violated these clearly-established public policies; defendant lacked an overriding legitimate business justification for its actions; and defendant's actions constitute a breach of public policy (Count VII).

## II. Findings of Fact

1.      Plaintiff is a Hispanic female.

2.      Plaintiff was hired by Convergys in 1999 as a Command Center Specialist, and she worked as a Command Center employee throughout her employment with Convergys.

2

3.      Command Centers are the departments responsible for coordinating and supporting the operations of the company's many call centers.  Convergys Command Centers are staffed by Associates and Managers, who are B-level employees, and Senior Managers, who are C-level employees.

4.      Senior Managers are responsible for day-to-day Command Center operations and for supervision of the B-level Managers and Associates.  Senior Managers report to Directors, who supervise multiple Command Centers and who in turn report to a Vice-President.

5.      Guerra worked as a Command Center Associate in Brownsville, Texas until 2000, when the Brownsville Command Center closed.  At that time, Guerra received a promotion to Associate Manager and transferred to Tamarac, Florida.  Guerra worked in Tamarac as an Associate Manager until that Command Center also closed, at which time she transferred to Jacksonville, Florida.

6.      As an Associate Manager and later as a Manager in Jacksonville, Guerra had management responsibilities and she directly supervised a number of subordinate employees.

7.      In 2003, Guerra voluntarily left Convergys to pursue a job with a company in the Phillippines.  Several months after her departure, Convergys successfully recruited her back.  Guerra returned to Jacksonville as a Manager in February 2004, and she worked in that position until she received a promotion to Senior Manager in September 2006.

8.      From February 2004 until her promotion in September 2006, Guerra reported to Senior Manager Kermit Russell.  In his evaluations of Guerra during that time period, Russell generally gave Guerra positive marks.

3

9.    Among other positive comments, Russell commended Guerra for her work coordinating and promoting diversity training in the workplace, and in her March 2006 evaluation, he noted that Guerra's diverse points of view and abilities allowed the team as a whole to continue to be successful.

10.   In the summer of 2006, Convergys announced plans for the further consolidation of Command Centers and the creation of a new Command Center at its corporate headquarters in Cincinnati.  The Cincinnati Command Center would absorb the functions of a number of other Command Centers slated for consolidation.

11.   After the announcement, Guerra applied for one of two C-Level Senior Manager positions that were being created at the Cincinnati Command Center.

12.   Soon after Guerra applied for the position, she was selected to travel to Cincinnati to begin training new employees hired to staff the Cincinnati Command Center.  While in Cincinnati for training, Convergys notified Guerra that she had been selected for the Senior Manager position and it offered her the promotion, which she accepted.

13.   In September 2006, when Guerra received her promotion to Senior Manager, Michael Stitt was the Director overseeing Convergys' Command Centers.  Stitt reported to Steve Heffron, Vice-President of Operations.

14.   Guerra was one of two C-level Senior Managers hired to manage the new Cincinnati Command Center.  The other was Ellis Halbert.

15.   With the exception of one B-level employee who transferred to Cincinnati from Jacksonville in late October 2006, all of the B-level employees who worked in the Cincinnati Command Center during Guerra's employment were new hires who had no prior experience working in a Convergys Command Center.

4

16.   After Guerra had been working at the Cincinnati Command Center for a very short time, employees made complaints.

17.   On November 7, 2006, Guerra was scheduled to meet with her new boss, Ann Lamar Tuten, for the first time. Tuten had replaced Stitt and both Halbert and Guerra now reported to her. Guerra's aunt was scheduled to arrive on a morning flight in Columbus, Ohio. Because Guerra did not want to be late to her meeting with her new boss, she called Farai Chirawu, a third-shift employee, at approximately 4:30 a.m. while he was at work. Chirawu was scheduled to work until 7:00 a.m. that day. Chirawu agreed to make the trip to Columbus. He met Guerra outside the office at approximately 5:00 a.m. After making the trip, Chirawu returned Guerra's car to her at the office.

18.   Alan Eldridge, a Human Resources Specialist, subsequently met with plaintiff. Eldridge testified at his deposition that he sat down with plaintiff and went over the allegations that had been made, plaintiff acknowledged them, and she specifically acknowledged the incident with Chirawu and that she had her staff run personal errands. Eldridge depo., pp. 85-86. Eldridge informed Guerra that she would be suspended from work pending the conclusion of the investigation. Plaintiff testified at her deposition that she spoke with Eldridge between her suspension and termination and he told her that one employee, Elizabeth DeBord Chaulk, had recanted her story. Plaintiff's depo., p. 180.

19.   On November 16, 2006, Eldridge and Tuten met with Guerra to tell her she was terminated.

20.   According to Heffron, Tuten made the decision to terminate plaintiff and he approved it. Heffron depo., pp. 18, 22. Tuten testified that Human Resources Support, primarily Eldridge, and the legal team were involved in the decision, she was aware that Eldridge

5

had conversations with legal counsel Bill Ford, and it was a collective decision that she

and Heffron ultimately approved.  Tuten depo., pp. 34-35.  Eldridge testified that he

could not recall whether he made a recommendation that plaintiff be terminated.  He

stated that Tuten and "her boss," whose name he could not recall, were involved in the

decision.  Eldridge depo., pp. 32-33.

### III.  Summary Judgment Standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination

of an action.  This Court may only grant summary judgment as a matter of law when the moving

party has identified, as its basis for the motion, an absence of any genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest

upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing

that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)

(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of

the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.

*Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

However, a district court need not view the facts in the light most favorable to the nonmoving

party if that party's version of events is "blatantly contradicted by the record, so that no

reasonable jury could believe it."  *Scott v. Harris*, 127 S.Ct. 1769 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to

decide whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  There is no

genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party.  *Id*. at 249 (citing *Cities Serv.*, 391 U.S. at 288-289).  If the

evidence is merely colorable, ***Dombrowski v. Eastland,*** 387 U.S. 82, 84 (1967), or is not

significantly probative, ***Cities Serv.,*** 391 U.S. at 290, judgment may be granted.  ***Anderson***, 477

U.S. at 249.

### IV.  Motion for Summary Judgment

Defendant Convergys moves for summary judgment on all claims against it.  Defendant

argues that plaintiff cannot establish a prima facie case of national origin or race discrimination

because neither Heffron nor Tuten knew that she was a member of a protected class in terms of

race or national origin.

Moreover, defendant claims plaintiff cannot establish pretext.  Defendant asserts it

terminated plaintiff's employment in November 2006 for misconduct in violation of Convergys'

Code of Business Conduct.  Defendant claims that in the two months following her promotion to

Senior Manager in its Cincinnati Command Center, plaintiff demonstrated unethical behavior,

poor judgment, and managerial misconduct so serious that numerous employees were compelled

to complain to her supervisor.  Defendant contends that the following complaints were among

those that five employees made about Guerra and reported to Tuten:

- Guerra frequently texted Fraley;.

- Guerra requested that Fraley help her apartment search three to four nights per week for multiple weeks.  Fraley was afraid to decline due to fear of retaliation and when she finally did decline, Guerra gave her "the silent treatment;"

- Subordinate employee Elizabeth DeBord Chalk reported that Guerra talked to her in detail about an argument between Halbert and Guerra regarding vacation time (although Chalk allegedly recanted this allegation before plaintiff was terminated);

- All five employees reported that Guerra spent an excessive amount of time behind closed doors with an employee with whom she previously had worked in Jacksonville, Florida;

- All employees reported a fear of declining Guerra's personal requests due to "fear of retaliation;"

7

- Subordinate employees Chaulk and Mike Rott reported that Guerra had asked an employee to make a veterinarian/kennel appointment and when the employee told Guerra she did not have time to make the appointment, Guerra instructed her to stop what she was doing and "just make it real quick."  It actually took the employee quite a while to find a vet that would see the animal (Chaulk allegedly recanted her story before plaintiff's termination);

- Guerra asked Fraley to find friends to help her unload her moving truck.  When Fraley could not find anyone willing to help, Guerra got mad at her and stopped talking to her for "a few days;"

- Guerra had Fraley make air travel arrangements for her aunt to visit Cincinnati; and

- Tammy Pacholke reported that Guerra asked another employee to leave work to go to a distant airport to pick up Guerra's aunt, which the employee did as requested, leaving work early to do so.

Defendant contends that in the investigation that followed, the employee complaints were corroborated and admitted by plaintiff.  Defendant claims that her supervisors discovered she had engaged in serious conduct violations, which included directing a subordinate employee to leave two hours before the end of his shift and sending him to the Columbus, Ohio airport to provide transportation for her aunt.  Defendant contends that regardless of any dispute as to what plaintiff did or did not actually do, there is no dispute that her subordinate employees and co-manager did complain that she engaged in the misconduct; there is no evidence these reasons did not motivate her discharge; and there is no evidence that the reasons given were not sufficient to motivate the discharge.  Defendant contends that Tuten met with plaintiff and reviewed each complaint with her; plaintiff admitted to making bad decisions, did not deny the complaints, and apologized for her actions; and after Tuten met with plaintiff, Tuten provided a summary to the company's Human Resources' Department and Eldridge, who conducted an independent investigation of the reported misconduct.  Defendant also claims that Eldridge interviewed plaintiff on November 10, 2006, and told her at the conclusion of the meeting that she would be

8

suspended from work following the conclusion of his investigation.  Plaintiff's depo., pp. 136-37.  Defendant claims that Tuten and Heffron recommended that plaintiff be terminated and that Eldridge agreed with the recommendation in the report he submitted to his supervisor and defendant's legal department.

In addition, defendant claims there is no evidence that the decision-makers did not honestly believe that plaintiff had engaged in the misconduct for which she was terminated.  They cite *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001), for the proposition that as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.

Finally, defendant argues that plaintiff's public policy claim fails for the same reasons her discrimination claims fail and because the statutory bases for the policies at issue contain specific legal remedies to enforce those policies.

In response, plaintiff notes that defendant does not dispute her prima facie case of gender discrimination and that it disputes only the first prong of her race and national origin discrimination claims on the ground that the individuals involved in the termination decision did not know she is Hispanic.  Plaintiff argues that she can establish a genuine issue of fact on this point because Eldridge listed her as "Hispanic/Latino" when communicating the termination decision to defendant's counsel, William Ford, and he had gathered that information from her personnel file.  Eldridge depo., p. 57.  Moreover, plaintiff notes that Eldridge, Tuten and Heffron had all met her prior to her termination.  Tuten depo., pp. 47-48; Eldridge depo., p. 57; Heffron depo., p. 22.

Plaintiff also argues that she can establish a genuine issue of material fact as to whether

9

defendant's articulated reasons for her termination are a pretext for discrimination.  Plaintiff

contends that although defendant alleges she violated its Code of Business Conduct, defendant's

witnesses could not agree at their depositions on the specific provisions of the Code that she

allegedly violated, how many times she violated it, or how serious the violations were.  Plaintiff

also alleges that defendant's witnesses failed to consistently identify the decision makers

involved in the termination decision.

Plaintiff further contends that a jury could find that each reason defendant has articulated

for the termination decision has no basis in fact, was not the real motivation for the termination

decision, or was insufficient to motivate the decision.  Plaintiff's specific challenges to the

articulated reasons are as follows:

- Plaintiff denies that she spent an inordinate amount of time in her office with Kat Anglage, the employee who transferred to the Cincinnati Command Center from Jacksonville.  She claims that neither Tuten nor Eldridge spoke to Anglage during the course of any investigation into the allegations against her, and she denies spending more time with Anglage than with any other employee.

- Plaintiff further alleges that a jury could reject defendant's allegation as insufficient to motivate her termination because two allegedly similarly-situated employees engaged in comparable behavior and were not terminated.
  First, she alleges that Fraley complained about Mark Williams, a Caucasian Senior Manager in the Cincinnati Command Center hired after plaintiff's termination, who was not disciplined when he misused company time by imitating a movie character by making inappropriate gestures involving his buttocks and by discussing tatoos with employees. *See* Fraley depo., pp. 44-45; Williams depo., pp. 48, 57-58.
  Second, she contends that she complained to Human Resources about Russell golfing and fishing with subordinates on company time.  *See* Plaintiff depo., pp. 77-78.  However, in October 2007, rather than terminating Russell, Tuten placed him on a Performance Improvement Plan for misreporting his time, overusing break time, and failing to put in the minimal time required.

- Plaintiff argues that a jury could reject defendant's assertion that she took advantage of her authority by directing subordinates to use company time to do her personal business as based on exaggeration, having no basis in fact, or insufficient to motivate her termination.

10

First, plaintiff denies that she asked Chaulk to make a veterinary appointment for her dog (Plaintiff's depo., p. 143) and she points to Chaulk's deposition testimony that she could not say whether it took her longer than 30 minutes to find a veterinarian to dispute an alleged assertion by defendant that it took Chaulk "hours" to make a veterinary appointment.

Second, plaintiff disputes that Fraley made travel arrangements for her aunt, instead claiming that she asked Fraley to look up a flight schedule for her while she was out of town and without internet access.

Third, plaintiff disputes that she misused her authority to pressure Chirawu into taking her aunt to the airport. Plaintiff claims that Chirawu agreed to drive her aunt as a favor to her after she contacted him to find out how long it would take her to get to the airport. She claims Chirawu made the offer after Tuten asked to meet with her the morning her aunt was arriving, she realized she would not have enough time to travel to Columbus and be back in time for the meeting, and she was unaware Chirawu would have to leave work early. *See* plaintiff's depo., pp. 152-156, 253, exh. 24; Chirawu depo., pp. 15-17, 27.

- Plaintiff claims that a jury could reject as untrue or irrelevant testimony by defendant's witnesses that she created an environment of inappropriate preferential treatment, fear and/or retaliation. Plaintiff contends that although Tuten alleges that five employees complained they feared retaliation by her, both Chaulk and Chirawu denied in their deposition testimony ever fearing retaliation by plaintiff (*See* Chaulk depo., pp. 31-32; Chirawu depo., p. 26) and defendant did not present any testimony from the other three employees. Plaintiff further alleges that a jury does not have to believe Tuten and Eldridge's claim that the employees feared plaintiff would use preferential treatment in setting their work schedules because between October and November, plaintiff and Halbert collectively set the monthly schedules and Chaulk testified that she simply worked harder to earn a better schedule. Chaulk depo., p. 32.

- Plaintiff claims that defendant cannot rely on Fraley's testimony to establish alleged "preferential treatment and retaliation" by plaintiff because plaintiff denies retaliating against Fraley and initiating social activities with her.

- Plaintiff further alleges that a jury could reject defendant's claim that plaintiff acted unprofessionally as insufficient to motivate her termination.

- Plaintiff contends that a jury could reject defendant's allegation that she put both Chirawu and defendant at risk when she asked Chirawu to drive her aunt to the airport as an exaggeration designed to bolster support for a discriminatory termination decision. Plaintiff contends that defendant's witnesses provided inconsistent testimony on this point because Tuten denied ever considering Chirawu's condition (presumably fatigue at the conclusion of his shift) when making the termination decision, and Chirawu admitted he was not concerned about his own safety.

Plaintiff further alleges that the court should reject any argument by defendant that it

honestly believed she had engaged in misconduct at the time of her termination because Eldridge refused to allow her to tell her side of the story. *See Archer v. Mesaba Aviation, Inc*., 2000 WL 376677 *5 (6th Cir. 2000) (unpublished) (decision maker had conflicting facts and never permitted plaintiff to give his side of the story); *Shaw v. Danley,* 2000 WL 64945 *5 (6th Cir. 2000) (unpublished opinion) (defendant failed to question the plaintiff about the allegations of misconduct). She alleges that Eldridge generally described that employees had complained about perceived retaliation and she responded to some allegations, but he did not give her specific details about the complaints and he took no notes of their conversation. Plaintiff also contends that a jury could infer from the fact that Eldridge and Tuten admitted to discarding the notes they allegedly took during the investigation that those notes were not favorable to defendant.

    As evidence of a discriminatory bias, plaintiff asserts that although Halbert's position and

hers were supposed to be equal, Halbert earned approximately $9,000 more than she did.[1]

In reply, defendant contends that plaintiff's subjective beliefs as to how it should have investigated her misconduct is not admissible evidence of pretext. Defendant further argues that the alleged inconsistencies to which plaintiff points do not support a finding of pretext because they are unfounded and immaterial. Defendant challenges plaintiff's contention that the information allegedly disclosed during its investigation and in the summaries of witness interviews is inadmissible. Defendant cites several cases for the proposition that witness statements contained in an investigative report may be considered on summary judgment. ***See e.g. Michael v. Caterpillar Fin. Services Corp.,*** 496 F.3d 584, 599-600 (6th Cir. 2007); ***Haughton v. Orchid Automation***, 206 Fed. Appx. 524, 533 (6th Cir. 2006). Defendant also cites authority for the proposition that the fact that an employee denies that she engaged in some other acts of misconduct does not suffice to defeat summary judgment. ***Jones v. Ohio State Univ.,*** 2007 WL 1574115 * 10 (S.D. Ohio 2007) (unpublished decision).

Second, defendant points to an email that plaintiff sent to Eldridge on the date she was terminated to show that plaintiff was given notice of the reasons for her suspension and termination. ***See*** Doc. 37-2, exh. 24. In the email, plaintiff stated that she wanted to address allegations that Eldridge had raised with her on November 10, 2006.

Third, defendant contends there is no evidence that contradicts defendant's evidence showing that Tuten and Eldridge received complaints of perceived retaliation by plaintiff from all five subordinate employees; Fraley gave testimony about her complaints (Fraley depo., p.

---

[1]Plaintiff fails to develop this point, but defendant stated at oral argument that Halbert had been employed at Convergys longer than plaintiff. Because of plaintiff's break-in-service during 2003-2004, it appears that Halbert did have more cumulative years of service, and more years at a higher management level, than did plaintiff.

51); Chaulk did not deny that she had raised complaints of perceived retaliation but simply could not recall doing so (Chaulk depo., pp. 20, 39); and plaintiff admits that Eldridge reported that subordinate employees had complained of "perceived retaliation" by her.

Fourth, defendant claims that plaintiff has not demonstrated that the company retained any employee who was similarly-situated to her.  Defendant contends that the conduct Mark Williams allegedly engaged in was not comparable to misuse of company time and resources and that Heffron and Tuten had no knowledge of the employee complaints made against Williams. Defendant alleges that Kermit Russell never worked in the Cincinnati Command Center and there is no evidence that his situation was similar to that of plaintiff.

Fifth, defendant contends that consistent with its interrogatory answers,  its agents consistently testified that Tuten and Heffron made the decision to terminate plaintiff.

Finally, defendant alleges that there is no evidence that Eldridge, Heffron and Tuten disagreed on the conduct plaintiff engaged in which required her termination, even though they may have used different words to describe the grounds for the decision.

## V.  Applicable Law

### A.  Race/National Origin and Gender Discrimination Claims

Under the law of this Circuit, the same evidentiary framework applies to discrimination claims brought under Title VII and state law.  *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992).  A plaintiff claiming discrimination must support her claim with either direct or circumstantial evidence.  *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007) (overruled on other gds.) (citing *Smith v. Chrysler Corp*., 155 F.3d 799, 805 (6th Cir. 1999)).  A plaintiff who lacks direct evidence of discrimination may establish a prima facie case of race, national origin or gender discrimination through circumstantial evidence by showing that: 1) she

14

is a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position lost; and 4) she was replaced by an individual outside the protected class. *Mitchell,* 964 F.2d at 582. Plaintiff may also establish the fourth prong of a prima facie case of discrimination by showing that she was treated less favorably than a similarly-situated individual outside the protected class. *See Clayton v. Meijer, Inc.,* 281 F.3d 605, 610 (6th Cir. 2002).

If the plaintiff seeks to establish that she was treated less favorably than a similarly-situated individual, she must prove that all relevant aspects of her employment situation were similar to those of the employee with whom she seeks to compare herself. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998). To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct. *Id.* (quoting *Mitchell,* 964 F.2d at 583); *Smith v. Leggett Wire Co.,* 220 F.3d 752, 762 (6th Cir. 2000). "[T]he weight to be given to each factor can vary depending upon the particular case." *Johnson v. Kroger Co*., 319 F.3d 858, 867 (6th Cir. 2003). As stated by the Sixth Circuit in *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005),

> [The plaintiff] need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly situated.' Rather, [the plaintiff] and the employee with whom he seeks to compare himself must be similar in 'all of the relevant aspects.' *Ercegovich*, 154 F.3d at 353.

In order for the conduct of a comparator to be considered the "same" as that of the plaintiff, it must be "similar in kind and severity." *See Barry v. Noble Metal Processing, Inc*.,

276 Fed.Appx. 477, 483 (6th Cir. 2008) (citing *Clayton*, 281 F.3d at 611). Further, the determination of whether the plaintiff and another employee shared the same supervisor must be made "on a case-by-case basis and does not depend entirely on whether the two shared the same immediate supervisor." *Id*. (citing *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)). Rather, "in many instances the term 'supervisor' should be construed broadly to include cases where both employees' situations were handled by the same 'ultimate decision-maker.'" *Id*. at 481 (citing *McMillan*, 405 F.3d at 414). Accordingly, the Court in *Barry* concluded that under *McMillan* and *Seay v. Tenn. Valley Auth*., 339 F.3d 454, 459 (6th Cir. 2003), two employees who are directly supervised by different individuals are not necessarily dissimilar if the same member of management disciplined both the plaintiff and the comparable employee. *Id*.

The employer is entitled to summary judgment if the plaintiff does not establish a prima facie case. If the plaintiff establishes a prima facie case, the employer can overcome the prima facie case by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If the employer carries its burden, the plaintiff must show that the reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Id.* at 804.

The Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the employer's decision; or 3) the reasons were insufficient to warrant the decision. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other gds.). The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, i.e., that the reason is factually false. *Id.* The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not

16

discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge. *Id.* If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises. *Id.* For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, plaintiff must introduce additional evidence of discrimination because the reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination. *Id.*

The Sixth Circuit has cautioned that Manzer's three-part test is not to be applied in a formalistic manner. *See Chen v. Dow Chemical Co*., 580 F.3d 394, 400 n.4 (6th Cir. 2009). Rather, the court must bear in mind that "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id*. The court must ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation and, if so, how strong the evidence is. *Id*. The court explained that:

> At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148 (2000). ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Id*.

In order to establish pretext, a plaintiff must allege more than a dispute over the facts upon which her discharge was based. *Braithwaite v. Timken Co.,* 258 F.3d 488, 494 (6th Cir.

2001).  The plaintiff must also put forth evidence that demonstrates the employer did not

"honestly believe" in the proffered non-discriminatory reason for its adverse employment action.

*Id.* (citing *Smith v. Chrysler Corp*., 155 F.3d 799, 806-07 (6th Cir. 1998)).  An employer has an

honest belief in its nondiscriminatory reason for discharging the employee "where the employer

reasonably relied 'on the particularized facts that were before it at the time the decision was

made.'" *Majewski*, 274 F.3d at 1117 (citing *Chrysler Corp*., 155 F.3d at 807).  In determining

whether an employer "reasonably relied on the particularized facts then before it," it is not

necessary that "the decisional process used by the employer be optimal or that it left no stone

unturned."  *Id*.  "Rather, the key inquiry is whether the employer made a reasonably informed

and considered decision before taking an adverse employment action."  *Chrysler Corp*., 155 F.3d

at 807.  As long as an employer has an honest belief in its proffered nondiscriminatory reason for

discharging an employee, the employee cannot establish that the reason was pretextual simply

because it is ultimately shown to be incorrect.  *Majewski,* 274 F.3d at 1117 (citing *Chrysler

Corp*., 155 F.3d at 806).

　　　　One way for the plaintiff to demonstrate pretext is to show that the "asserted business

judgment was so ridden with error that defendant could not honestly have relied upon it."

*Wexler v. White's Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003) (citing *In re Lewis,* 845

F.2d 624, 633 (6th Cir. 1988)).  The court may not secondguess the employer's business

judgment but must simply evaluate "whether the employer gave an honest explanation of its

behavior."  *Hedrick v. W. Res. Care Sys*., 355 F.3d 444, 462 (6th Cir. 2004).

　　　　The court may consider on summary judgment witness statements contained in an

investigative report "not to prove their truth, . . . but to demonstrate the state of mind and motive

of Defendant's managers in discharging Plaintiff." *Michael v. Caterpillar Fin. Servs. Corp*., 496

F.3d 584, 598 (6th Cir. 2007) (quoting **Haughton**, 206 Fed.Appx. at 532).

## V. Resolution

### A. Discrimination Claims

Plaintiff has come forward with sufficient evidence to establish a prima facie case of race/national origin and gender discrimination. A reasonable jury could find based on the evidence of record that one or more of the individuals involved in the decision to terminate plaintiff knew she is Hispanic. Defendant does not allege that plaintiff has failed to establish any other prong of a prima facie case of race/national origin or gender discrimination.

Defendant has articulated legitimate, nondiscriminatory reasons for plaintiff's termination. Defendant claims in the short period of time following her promotion to Senior Manager in its Cincinnati Command Center, plaintiff demonstrated unethical behavior, poor judgment, and managerial misconduct so serious that numerous employees complained to her supervisor. For the reasons set forth below, the Court finds that plaintiff has come forward with sufficient evidence to enable a jury to reasonably doubt defendant's explanation and find that it is a pretext for unlawful gender and race/national origin discrimination.

First, there is evidence that another employee outside of the protected classes, Russell, was not discharged even though he engaged in conduct substantially identical to that which purportedly motivated plaintiff's discharge. Evidence in the record indicates that Russell, while employed as Senior Manager of the Jacksonville Command Center under Tuten's supervision, was placed on a Performance Improvement Plan as the result of a number of perceived performance problems.[2] These included (1) not putting in the minimal time required, (2) overuse of break time, (3) improper time reporting, (4) a lack of leadership presence and failure to set

_____

[2] The manager's signature on the PIP is not legible, but it may be that of Tuten.

19

good examples for the staff, and (5) failure to self-manage time and behavior appropriately.  The PIP listed ways for Russell to improve his management methods and practices to insure that the performance and behavior issues did not reoccur.  Two of these were as follows:

> •  You have a responsibility to be honest with your work related time.  This means recording time accurately, keeping absences to a minimum, arriving on time, working the duration of your shift and limiting personal business during work time.
>
> •  You are expected to conduct yourself with the highest level of professionalism.  This includes such things as not engaging in inappropriate conversations with your staff regarding your view of management . . .

A  reasonable jury could find that the perceived issues which led Convergys to place Russell on a PIP were substantially similar to those which purportedly motivated plaintiff's discharge.

Second, a reasonable jury could find based on the circumstances surrounding plaintiff's termination that the reasons defendant has given for the decision did not actually motivate the decision.  Although defendant alleges that plaintiff violated its Code of Business Conduct by engaging in serious managerial misconduct and unethical behavior, those involved in the decision could not agree at their depositions on the provisions of the Code that she allegedly violated, the number of violations, or how serious the violations were.  In addition, there is evidence that at least one employee, Chaulk, recanted her story before plaintiff was terminated. There is also evidence which suggests that defendant exaggerated the employee complaints against plaintiff for reasons that remain unclear and require further development at trial.

A reasonable juror could also question how plaintiff's work performance and behavior had deteriorated to the point where defendant lost all confidence in her in the very brief period of time between her transfer to Cincinnati and her meeting with Tuten on November 7, 2006.  Prior to her transfer to the Cincinnati Command Center, plaintiff had by all accounts had an

impressive career with Convergys.  Yet, in a matter of weeks between her transfer and her meeting with Tuten, plaintiff purportedly began to suddenly demonstrate unethical behavior, poor judgment and managerial misconduct which was so serious it could not be remedied.  This conduct was reported to Tuten by plaintiff's co-manager Halbert, who passed along his own subjectively vague and negative observations of plaintiff, including referring to an "aggressive confrontation" plaintiff had had with him regarding vacation requests and claiming that she "overreacted with subordinates."  A reasonable jury might deduce from the precipitous change in circumstances and defendant's unwillingness to allow plaintiff an opportunity to remedy any problems, as it had with Russell, that a reason other than serious Code of Business Conduct violations was the motivating factor behind plaintiff's termination.

In short, this is not a situation where plaintiff simply claims that defendant's reasons for terminating her were incorrect or that she disagrees with those reasons.  To the contrary, plaintiff has produced sufficient evidence to allow a jury to reasonably doubt her employer's explanation for her termination and to find that it was a pretext for discrimination.  Defendant therefore is not entitled to summary judgment on plaintiff's discrimination claims.

## B.  Public Policy Claim

Plaintiff does not contest summary judgment on her public policy claim.  Accordingly, the Court will enter summary judgment in defendant's favor on this claim.

21

## VI. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment is hereby **GRANTED** as to plaintiff's public policy claim and **DENIED** as to her claims for gender and national origin/race discrimination.  This case will proceed to trial on the discrimination claims in accordance with the schedule established by the Court.

**IT IS SO ORDERED**.


S/ Herman J. Weber                              
HERMAN J. WEBER, SENIOR JUDGE
UNITED STATES DISTRICT COURT